IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| PINNACLE AGRICULTURE DISTRIBUTION, INC., | : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:17-CV-29 (LJA) |
| MAYO FERTILIZER, INC.; JEFF BRADLEY; and JASON BRADLEY, | : : : | |
| Defendants. | : : : | |

## ORDER

Before the Court is Plaintiff Pinnacle Agriculture Distribution, Inc.'s ("Pinnacle") Motion for Preliminary Injunction (Doc. 4), in which Plaintiff seeks to enjoin Defendants Mayo Fertilizer ("Mayo"), Jeff Bradley, and Jason Bradley (Jeff and Jason Bradley, collectively are referred to hereafter as "The Bradleys") from using any confidential information and trade secrets belonging to Plaintiff and to cease doing business with any customer or supplier acquired through the use of such confidential information and trade secrets. The Court previously granted Plaintiff's Motion for a Temporary Restraining Order on February 7, 2017 (Doc. 12); and, on February 22, 2017, the Court held a hearing on Plaintiff's Motion for a Preliminary Injunction. Based on the testimony and evidence presented therein, the Court made a finding of good cause to extend the Temporary Restraining Order for an additional fourteen days while the Court addressed Plaintiff's Motion for Preliminary Injunction. *See* Fed. R. Civ. P. 65(b)(2). As set forth more fully below, the Court finds that Plaintiff has met its burden as to each of the four prerequisites for issuing a preliminary injunction. Accordingly, Plaintiff's Motion for Preliminary Injunction (Doc. 4) is **GRANTED**.

1

# FINDINGS OF FACT[1]

Pinnacle and Mayo are competing agricultural supply companies that both do business in the Sylvester, Georgia area. Until February 3, 2017, Pinnacle employed Jeff Bradley as the Location Manager, and Jason Bradley as the Warehouse Manager, of its Sylvester, Georgia location. As location manager, Jeff Bradley had the authority to bind Pinnacle in any contracts for amounts less than $2500, including for ordering supplies and for repairs and maintenance. He also had the authority to bind Pinnacle by establishing pricing for customers on fertilizer and seed. As warehouse manager, Jason Bradley was responsible for ordering and managing inventory, and did not require prior approval from anyone else at Pinnacle before making these decisions.

On December 9, 2016, Pinnacle received notice from its landlord that the lease of the Sylvester location would not be renewed. On the same day, Cole Gholston, Jeff Bradley's supervisor, called Jeff Bradley to inform him that the lease would not be renewed, and asked him to relocate all of Pinnacle's assets to Pinnacle's Dawson, Georgia location. Dawson, Georgia is about an hour away from Sylvester, Georgia and Pinnacle planned to conduct its Sylvester business from there. Mr. Gholston also asked Jeff Bradley to begin searching for a new location in Sylvester. Mayo replaced Pinnacle as the tenant in the Sylvester warehouse.

On February 1, 2017, Mr. Gholston visited the warehouse because he had heard that Pinnacle employees had not vacated the Sylvester location or begun reporting to the Dawson location as he requested. During his visit, Mr. Gholston found that Jeff Bradley was still working out of the Sylvester location and that several of Pinnacle's assets were still at the Sylvester warehouse. As of February 1, 2017, the Bradleys were still employed by Pinnacle. Mr. Gholston then called the Pinnacle attorneys and asked them to do an e-mail search to determine if any confidential information had been passed from Pinnacle to Mayo. The search revealed that confidential information had indeed been passed to Mayo. The search also revealed multiple e-mails indicating the Bradleys' intent to leave Pinnacle and work for Mayo, as well as e-mails indicating that the Bradleys were already working for Mayo in

---

[1] The Court makes the following findings for the limited purpose of deciding Plaintiff's Motion for a Preliminary Injunction and based on the evidence submitted during the hearing held on the Motion. *See United States v. Jefferson County*, 720 F.2d 1511, 1519 n. 21 (11th Cir. 1983) (noting that "the trial judge's conclusions of law as well as his findings of fact at the preliminary injunction stage are not binding on him in his determination of the merits.")

2

January 2017. As soon as Pinnacle became aware of the search results, Pinnacle terminated the Bradleys' employment, effective February 3, 2017. Below is a summary of relevant e-mails:

- December 20, 2016: Jason Bradley emailed an employee of Mayo Fertilizer from his Pinnacle account. Attached to the e-mail was a document containing Pinnacle's vendor information. (Plaintiff Ex. 4). In the body of the e-mail, Jason Bradley wrote, "Jason Bradley with the new and upcoming location in Sylvester, Ga. I'm just trying to get a head start on setting up vendors who we will use frequently. I was told to send this info to you?" *Id.*

- December 21, 2016: Jason Bradley received an e-mail from Brenda Hammons, of Hinton Oil. Hammons expressed her understanding that Pinnacle was changing its name to Mayo Fertilizer beginning in 2017, but would continue to do business from the same location. (Plaintiff Ex. 5). Ms. Hammons informed another Hinton Oil employee that he should send a new W-9 to Jason Bradley's Pinnacle e-mail account. *Id.*

- December 29, 2016: Jeff Bradley was copied on an e-mail between two Mayo employees listing employees who will need insurance through Mayo, including Jeff and Jason Bradley. (Plaintiff Ex. 6).

- December 30, 2016: E-mail from Jason Bradley to Mayo employee, attaching new hire forms for Jeff Bradley. (Plaintiff Ex. 7).

- January 6, 2017: E-mail from Jason Bradley's Pinnacle account to Mayo employee. The body of the e-mail reads, "Just checking to see if this email is working this morning. Love Britt." (Plaintiff Ex. 8). Britt Garwood is a Mayo employee. Garwood previously had been employed by Plaintiff.

- January 6, 2017: E-mail from Jeff Bradley to Jason Bradley containing a pivot table, also known as an accounts receivable list, which includes the following information on all of Plaintiff's customers: name, balance, credit information, credit risk, past due status, and pending litigation. (Plaintiff Ex. 9)

3

- January 9, 2017: E-mail from Jason Bradley's Pinnacle account to Mayo employee, signed by Britt Garwood, which attaches Pinnacle's policy on fringe benefits. (Plaintiff Ex. 10)
- January 10, 2017: E-mail from Jeff Bradley to Rickard Seed, a Pinnacle supplier, requesting that an order be sent "asap to my address listed as Mayo now." (Plaintiff Ex. 11)
- January 19, 2017: E-mail from Jeff Bradley to Mayo employee Britt Garwood attaching Pinnacle's Branch Sales Report, which details every product sold at the Sylvester location and the profit margin and rebate information for each sale. (Plaintiff Ex. 13)
- January 23, 2017: E-mail from Jeff Bradley to Britt Garwood that contained Pinnacle's profit and loss statement for December. (Plaintiff Ex. 16). The profit and loss statement details Pinnacle's revenue, up-front profit, rebate information, gross profit, expenses, and earnings before interest tax depreciation amortization. *Id.*
- January 23, 2017: E-mail from Jeff Bradley to Britt Garwood detailing Pinnacle's bonus plan. (Plaintiff Ex. 17)
- January 26, 2017: E-mail from Jason Bradley on his Pinnacle account to Southeast Ag asking for invoices to be sent to "jason@mayofertilizer.com" and complaining that his Pinnacle e-mail was "acting stupid." (Plaintiff Ex. 14)
- January 26, 2017: E-mail from Jeff Bradley to Britt Garwood with updated pivot tables attached. (Plaintiff Ex. 15)

With regard to the tables, vendor, and pricing information passed through the e-mails, the evidence establishes that Plaintiff took steps to keep that information confidential. Pinnacle required its employees to use password protection and stressed the importance of confidentiality to new hires through the company handbook.

Jeff Bradley has known Keith Shaw, the Vice President of Mayo, for over fifteen years, and says that he did not seriously begin talking to him about a job at Mayo until mid-January 2017. Jeff Bradley maintains that he did not begin working for Mayo until February

9, 2017.[2] Jeff Bradley has been in agricultural sales in Georgia for over twenty years, and services around fifty customers. He testified that he knows who his best and most loyal customers are without needing to reference a list. However, he was not able to recite any information on the pivot table or profit and loss statements from memory. In January, 2017, Jeff Bradley said he was using Pinnacle's pivot tables to collect outstanding balances from Pinnacle customers. He maintains that he sent the pivot table to Britt Garwood so that Britt could print it out for him at the Mayo warehouse since Jeff Bradley no longer had access to a Pinnacle printer. He also maintains that he sent Garwood the bonus information and had him print it off at Mayo so that Jeff Bradley could calculate his bonus. As of the date of the hearing, and despite the Court's Order and direction from his employer, Jeff Bradley still had some of these printed documents on his desk at Mayo.[3]

After terminating the Bradleys, Pinnacle had no other employees left to run the Sylvester location and does not believe that it will be able to find replacements until summertime. Pinnacle believes that it could service its Sylvester customers out of its Colquitt, Georgia location, or its Vienna, Georgia location. Other than convenience or emergency orders, Pinnacle cannot foresee any problems with servicing the Sylvester market from Colquitt or Vienna.

## DISCUSSION

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

---

[2] This statement is belied by e-mails showing that he had a Mayo e-mail address in early January. *See* Plaintiff's Ex. 11.
[3] The Court noted during the hearing on the Preliminary Injunction that it questioned the veracity of Jeff Bradley's testimony. When coupled with Jeff Bradley's failure to adhere to the Court's order regarding returning Plaintiff's information, the Court has afforded little weight to Jeff Bradley's testimony.

5

I.   **Likelihood of Success on the Merits**

Plaintiff's Complaint (Doc. 1) asserts the following claims: (i) breach of fiduciary duty against the Bradley's; (ii) misappropriation of trade secrets against all Defendants; (iii) tortious interference against all Defendants; and (iv) an additional tortious interference claim against Mayo.[4]

   a.   Breach of Fiduciary Duty

Under Georgia law, to establish a claim for breach of fiduciary duty, the Plaintiff must establish the existence of a fiduciary duty, breach of that duty, and damage proximately caused by the breach. *McConnell v. Department of Labor*, 337 Ga. App. 457, 463 (2016).

The Bradley's owed a fiduciary duty to Pinnacle.  "While an employer/employee relationship does not always create a fiduciary relationship, and employee who may bind his or her employer has a fiduciary duty to it." *Professional Energy Management, Inc. v. Necaise*, 300 Ga. App. 223, 226 (2009). As location manager, Jeff Bradley had the authority to bind Pinnacle in any contracts for amounts less than $2500, including for ordering supplies and for repairs and maintenance. He also had the authority to bind Pinnacle by establishing pricing for customers on fertilizer and seed. As warehouse manager, Jason Bradley was responsible for ordering and managing inventory, and did not require prior approval from anyone else at Pinnacle before making these decisions. Because Pinnacle authorized Jeff and Jason Bradley to act on its behalf in such a manner, an agency relationship existed between Pinnacle and the Bradleys. *See Hanson Staple Co., Inc. v. Eckleberry*, 297 Ga. App. 356, 358 (2009). "Where an agency relationship exists, the agent has a fiduciary duty to his principal. Thus as [Pinnacle]'s agent[s], [the Bradleys] owed a fiduciary obligation to [Pinnacle] during the term of [their] employment." *Id.*

Although "[a]n employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed," an employee breaches a fiduciary duty by "solicit[ing] customers for a rival business before the end of his employment" or engaging in "other similar acts in direct competition with the employer's business." *Necaise*, 300 Ga. App. at 225. Jason Bradley's e-mails reveal that he led two

---

[4] Plaintiff's claims for tortious interference are not related to the substance of the injunction that it seeks, so the Court will not address Plaintiff's likelihood of success on these claims.

6

suppliers/vendors to believe that they were still doing business with Pinnacle, under the name Mayo. (Plaintiff Exs. 5, 11). Jeff Bradley's e-mails reveal that he sent Pinnacle's customer lists to Britt Garwood, a Mayo employee. (Plaintiff Ex. 15). These actions go beyond merely soliciting customers or vendors during employment. *Cf. Nilan's Alley, Inc. v. Ginsburg*, 208 Ga. App. 145, 145 (1993) (holding that employee did not directly compete with employer's business by inquiring whether "in the event he left [employer]'s employment in the future, they would consider continuing to place their orders through him"). Instead, they reveal intent to deceive Pinnacle's vendors and share customer information with a direct competitor.

Defendants argue that even if the first two elements of a breach of fiduciary duty claim are satisfied, Plaintiff cannot possibly prove damages from the breach. Pinnacle has alleged that the Bradleys' breach of fiduciary duty has caused it harm. As a result of the breach, Mayo has enough proprietary and confidential information to solicit business from Pinnacle's customers and use Pinnacle's pricing strategies with vendors. Pinnacle is facing the loss of these customers, and the loss of competitive advantage that it had by keeping its vendor and profit information confidential.

Plaintiff does not have the burden of proving exact damages at the preliminary injunction stage. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing."). Plaintiffs must simply show "substantial likelihood of success on the merits." Plaintiff has alleged that that the Bradleys' breach of fiduciary duty caused it harm, and the Court finds that Plaintiff is substantially likely to be able to show that it suffered damages with the benefit of discovery.

    b. <u>Misappropriation of Trade Secrets</u>

Under the Georgia Trade Secrets Act (GTSA), "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." O.G.C.A. § 10-1-762. To state such a claim, a plaintiff must allege that: (1) it possessed a trade secret, and (2) the defendant

7

misappropriated the trade secret. *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003). The GTSA defines a "trade secret" as follows:

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. O.G.C.A. § 10-1-761(4).

The GTSA defines "misappropriation" as:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) Disclosure or use of a trade secret of another without express or implied consent by a person who (i) Used improper means to acquire knowledge of a trade secret; (ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) Derived from or through a person who had utilized improper means to acquire it; (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. O.C.G.A. § 10-1-761(2).

Pinnacle's profit and loss statements, pivot tables, and vendor lists are trade secrets. The GTSA explicitly includes financial data, customer lists, and supplier lists in the statute. Furthermore, the information was not commonly known to the public. Although Mayo may have been aware of some customer or supplier names in Sylvester, it was not aware of or capable of finding out the level of detail contained in any of the allegedly misappropriated materials. Pinnacle also took reasonable measures to secure its information, such as setting policies on confidentiality and requiring passwords before being able to access the

information. In a competitive market, these trade secrets also derive benefit from being kept confidential.

By sending profit and loss statements, pivot tables, and vendor lists to Mayo, the Bradleys misappropriated trade secrets. *See American Buildings Co. v. Pascoe Building Systems, Inc.*, 260 Ga. 346, 349 (1990) ("Even in the absence of an express agreement, it is an implied term of an employment contract that an employee will not divulge a trade secret learned by virtue of his employment to a competitor of his former employer."); O.C.G.A. § 10-1-761(2)(A). Mayo employees had access to these documents via e-mail, as well as access to Pinnacle employee e-mail accounts. At this stage and procedural posture, the evidence indicates that Mayo knew or had reason to know that these secrets were divulged through improper means, and thus misappropriated Pinnacle's trade secrets. *See* O.C.G.A. § 10-1-761(2)(b)(ii)(I).

## II. Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies. *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (quoting *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)); *see also Mohr v. Bank of New York Mellon Corp.*, 393 F. App'x 639, 646 (11th Cir. 2010).

In *Ferrero*, the Eleventh Circuit confronted the question of whether an employer would suffer irreparable harm if a former employee were allowed to solicit its top customers. The Court upheld the district Court's finding that the employer would "lose its investment in good will and [would] lose its long-time customers," and injury which would be "difficult, if not impossible to determine monetarily." *Ferrero*, 923 F.2d at 1449. Lower courts have reached similar conclusions. For example, in *Variable Annuity Life Ins. Co. v. Joiner*, the district court concluded that "[Plaintiff] will suffer irreparable injury if the [defendants] are allowed to continue use of [Plaintiff]'s client identity and account information to solicit [Plaintiff's]

9

customers because [Plaintiff] will be deprived of the value of the trade secret and confidential information in which it has invested significant time and money." 454 F.Supp.2d 1297, 1304 (S.D. Ga. 2006). In *Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, the district court found that Plaintiff would suffer irreparable harm if Defendant was "allowed to solicit patients from the same doctors and facilities that were referenced in the misappropriated Referral Logs" because it would give Defendant an "unearned advantage in the marketplace and will likely cause [Plaintiff] to lose patients and referral sources." 793 F.Supp.2d 1302, 1313-14 (N.D. Ga. 2011).

In this case, Pinnacle would be irreparably harmed if Defendants are allowed to solicit business from Pinnacle's customers and vendors. The purpose of a preliminary injunction is to freeze the position of the parties until a trial can be held on the merits. At this time, if the Court did not enter an injunction preventing Defendants from soliciting business from these customers, Pinnacle would likely lose these customers and the goodwill that it has worked to create with them. Defendant argues that Pinnacle would not be irreparably harmed because it would not have been conducting business with these customers regardless of Defendants actions, as Pinnacle did not have a lease on a location in Sylvester. Pinnacle, however, represents that it can service these customers from its other locations in Georgia. Accordingly, for purposes of the preliminary injunction inquiry, Plaintiff sufficiently has established that it will suffer irreparable harm absent an injunction.

### III.    Balance of Harms

As discussed above, without the injunction, Plaintiff faces a loss of customers and goodwill. Defendants, on the other hand, will only suffer the harm of not being able to solicit or establish new business with Pinnacle's customers with which it did not previously have a sales relationship. As Defendants will only be prevented from using information obtained unlawfully, they will not be harmed by the injunction. *See Amedisys Holding, LLC*, 793 F.Supp.2d at 1314. Furthermore, the customers will not be harmed, as Plaintiff can continue to service them from its other locations, or the customers can buy product from a different competitor that services the Sylvester area.

**IV.     Public Interest**

"There is a strong public policy for protecting trade secrets from misappropriation and in promoting fair competition." *Priority Payment Systems, LLC v. Signapay, LTD*, 161 F.Supp.3d 1294, 1304 (N.D. Ga. 2016). Furthermore, Georgia law specifically provides for injunctions in cases of "actual or threatened misappropriation" of trade secrets. O.C.G.A. § 10-1-762. Accordingly, Plaintiff has met its burden of showing that an injunction preventing Defendants from using its trade secrets is in the public interest.

## SCOPE OF THE INJUNCTION

Defendants argue that *Avnet v. Wyle Laboratories, Inc.*, 263 Ga. 615 (1993) controls the scope of the injunction in this case. In *Avnet*, the Georgia Supreme Court held that, while customer lists are considered trade secrets under Georgia law, employees' "personal knowledge of customer 'information'" is not a trade secret. *Id.* at 620. If this were simply a matter of Jeff Bradley's knowledge of the names and addresses of Pinnacle's customers or even the general contours of Pinnacle's contractual relationships with those customers, then the *Avnet* limitation would be applicable. However, the claim here is that Defendants are using proprietary pricing, business history, and other information contained in the allegedly misappropriated documents to secure business which might otherwise have gone to Pinnacle. The evidence as proffered to date indicates that Jeff Bradley did not merely leave Plaintiff with all of this information in his mind as a result of his experience and skill. Rather, the evidence indicates that he intentionally misappropriated this detailed data for the benefit of Mayo. This conclusion is bolstered by the fact that the allegedly misappropriated documents include information regarding Pinnacle customers with whom Jeff Bradley had no relationship. Reclaiming the documents does not address the harm resulting from the assimilation of this information by Jeff Bradley and other during the time that it was in Mayo's possession. *Avnet* goes to information that the employee possessed separate and apart from the misappropriation. The allegation here is that the information now in Jeff Bradley's mind was gained as a result of the misappropriation. Accordingly, the *Avnet* limitation is not appropriate here.

Accordingly, during the pendency of this case, Defendants and anyone acting in concert with Defendants are hereby **ORDERED**:

1. to refrain from using any confidential information and trade secrets belonging to Pinnacle, including but not limited to supplier lists, customer lists, pivot tables, branch sales reports, and financial information;
2. to refrain from conducting business with any retail customer acquired through the use of such confidential information and trade secrets. Defendants are not to do business with any customer with whom it cannot establish a preexisting sales relationship.
3. to return to Pinnacle any and all copies of such confidential information and trade secrets, as well as any other property of Pinnacle currently in their possession.

## **BOND**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Defendant asks for security in the amount of $7 million, relying on Pinnacle's sales budget. $7 million is an improper request because it reflects the amount of sales, not profits, that Pinnacle anticipated from the Sylvester location, and it assumes that all of Pinnacle's Sylvester business would choose to switch to Mayo, rather than continue with Pinnacle or do business with one of Pinnacle's other competitors. The Court considers $50,000 to be an appropriate bond in this case. *See Pirtek USA, LLC v. Twillman*, 2016 WL 5846978, at *9 (M.D. Fla. Oct. 6, 2016) (finding reasonable a $50,000 bond in unfair competition case); *Carillon Importers, Ltd. V. Frank Pesce Int'l Group Ltd.*, 112 F.3d 1125, 1126-27 (11th. Cir. 1997) (finding reasonable a $50,000 bond in a trade infringement case).

## **CONCLUSION**

Based on the foregoing, Plaintiff's Motion for Preliminary Injunction (Doc. 4) is **GRANTED**.


**SO ORDERED** in Albany, Georgia, this   6th   day of   March  , at   4:50    p.m.


                                           /s/ Leslie J. Abrams
                                          **LESLIE J. ABRAMS, JUDGE**
                                          **UNITED STATES DISTRICT COURT**